## J. FRANCIS KING *v.* J. E. WINANTS.

The law prohibits everything which is *contra bonos mores*, and therefore no contract which originates in an act contrary to the true principles of morality, can be made the subject of complaint in Courts of justice.

(*Blythe* v. *Lovingood*, 2 Ired. 20, cited and approved.)

RODMAN J. *Dissenting.*

CIVIL ACTION for the dissolution of a co-partnership, for an account and the appointment of a receiver, and in the meantime for an injunction, restraining the defendant from receiving moneys due the co-partnership, heard before *Russell, J.*, at Spring Term, 1874, of NEW HANOVER Superior Court.

It was referred to a referee, who after finding certain facts, reported as his conclusion, that the parties were never at any time partners *inter se*, whatever may have been their *status* as to third persons. And that the agreement between the parties, was in fraud of the city of Wilmington, illegal and void, and both parties being in *pari delicto*, no Court would lend its aid to either to enforce the contract in this case, to compel an account.

The plaintiff excepted to the report of the referee, and his Honor, on the trial below, sustained some of his exceptions, adjudging, among other things, that the plaintiff was entitled to an account, and referring it to the Clerk to take the account. From the orders and rulings of his Honor, the defendant appealed.

*Strange* and *Battle & Son,* for appellant.
*A. T. & J. London,* contra.

READE, J. The care and maintenance of certain sick persons in the service of the United States, and of the sick of the city of Wilmington, and of the county of New Hanover, were

let to the lowest bidder by the several governments, and the plaintiff and defendant, who were rival bidders for the same, entered into a contract not to bid against each other, so as to enable one or both to get the contract at a much higher rate, and divide the profits between them. It is not denied that this was a fraud upon those governments, and against public policy, and that the contracts could not have been enforced against those governments. But the contracts having been performed by the governments, and the parties coming now to settle the profits between themselves, and being unable to agree, it is insisted that the aid of the Courts may be invoked. And whether that can be, is the question.

*Ex turpi causa non oritur actio,* is a maxim as old as the law itself. The Courts will not lend their aid to enforce contracts founded upon considerations immoral or against public policy. And where the fault is mutual between the parties *in pari delicto, potior est conditio defendentis.*

Suppose, in the case before us, the parties had come to a settlement, and the defendant had given to the plaintiff his note for the amount due, could the plaintiff have recovered on the note? *Blythe* v. *Lovingood,* 2 Ired., 20, is an express authority that he could not. In that case, commissioners to sell land for the State proclaimed at the sale, that if the highest bidder did not comply, the next highest bid would be taken. The plaintiff and defendant were both bidders, the plaintiff the highest and the defendant next, and they entered into an agreement by which the plaintiff was not to comply with his bid, so that it might be given to the defendant, and the defendant was to give the plaintiff his note for $100 which he did, and the plaintiff sued him on the note. *Held,* that he could not recover. DANIEL, J. delivering the opinion said: "If the plaintiff intended to comply with the terms of the sale, but failed in consideration of the defendants executing to him the note, then the conspiracy had the effect of depriving the State of so much of the purchase money as made up the difference between the two bids; and such a transaction, we think, was fraudulent to-

wards the State. The plaintiff's counsel contends, that, if the parties intended to defraud the State, it could be taken advantage of by the State only, and not by the defendant, who has reaped the benefit, and was *particeps criminis* in the transaction. We are of a different opinion. The law prohibits every thing which is *contra bonos mores,* and therefore no contract which originates in an act contrary to the true principles of morality can be made the subject of complaint in the Courts of justice." And Judge DANIEL quoted from *Holman* v. *Johnson,* Cowper 343, where Lord MANSFIELD said, the objection that a contract is immoral or illegal, as between plaintiff and defendant, sounded at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded upon general principles of policy, which the defendant has the advantage of, contrary to the real justice between him and the plaintiff, by accident if I may say so. The principle of public policy is this, *ex dolo malo non oritur actio.* No Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise the action appears to arise *ex turpi causa,* or the transgression of a positive law of the country, then the Court says that he has no right to be assisted. It is upon this ground the Court goes; not for the sake of the defendant but because they will not lend their aid to such a plaintiff." We are of the opinion that the agreement in this case was in pursuance of a fraudulent design to deprive the State of a fair price for its land, and that the plaintiff ought not to recover."

Our case is much stronger than that. There the parties had settled their nefarious transaction and given a plain note on which the suit was brought; but here we are asked to aid them in their nefarious transaction to defraud the United States and the city of Wilmington and the county of New Hanover, not in the sale of a tract of land, but in the care of their sick. We are asked to go into all the transaction and to hear all the evidence and even their own conflicting statements as to the

precise manner in which they bargained with each other, and which was most faithless to the other, and which got the best share of the spoils, and to help them make a just division. The case of *Blythe* v. *Lovingood, supra,* has been followed by many others in our Courts. *McRae* v. *Atlantic and N. C. R. R. Co.,* 5 Jones Eq., 395; *Sharpe* v. *Farmer,* 4 Dev. & Bat. 122; *Ingram* v. *Ingram,* 4 Jones' 188; *Whitaker* v. *Bond,* 63 N. C. Rep. 290. In *Armstrong* v. *Toler,* 11 Wheat. R. 258, the subject was very much considered and it is a leading case in the Supreme Court of the United States. Mr. Justice WASHINGTON said: "The principle of the rule is that no man ought to be heard in a Court of Justice who seeks to enforce a contract founded in or arising out of moral or political turpitude." On appeal, the Supreme Court held that there was no error, and Chief Justice MARSHALL illustrates the cases in which the principle does and does not apply, and says: "The point of law decided is that a subsequent independent contract founded on a new consideration is not contaminated by the illegal importation," &c. And in a note to the case, found in Story on Agency, sec. 348, we have this very clear statement of the principle: "The distinction between the cases where a recovery can be had, and the cases where a recovery cannot be had, of money connected with illegal transactions which seems now best supported is this: that wherever the party seeking to recover, is obliged to make out his case by showing the illegal contract or transaction, or through the medium of the illegal contract or transaction, or when it appears that he was privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him connected with that contract. But when the advances have been made upon a new contract remotely connected with the original illegal contract or transaction, but the title of the party to recover is not dependent upon that contract, but his case may be proved without reference to it, then he is entitled to recover." And this explains *Brooks* v. *Martin,* 2 Wallace 70, which was chiefly relied on by the plaintiff. There the

parties were partners in buying up soldiers' claims contrary to law.

Mr. Justice MILLER, delivering the opinion, says : " When the bill in the present case was filed, all the claims of soldiers thus illegally purchased by the partnership with money advanced by the complainant had been converted into land warrants and all the warrants had been located or sold. The original defect in the purchase had, in many cases, been cured by the assignment of the soldier after its issue, a large portion of the land so located had also been sold and the money paid for some of it and notes and mortgages for the remainder. There were then in the hands of the defendant, land, money, notes and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced. It is to have an account of these funds and a division of these proceeds that this bill is filed." And it is plain that in that case there could have been an account and settlement without any reference whatever to the original illegal transaction, and the decision is put upon that ground. With this interpretation, that case is consistent with all the text writers and with innumerable decisions. Any other interpretation puts it off to itself. But in our case, it is the very illegal contract itself between the parties, that we are called upon to examine into, settle up and enforce. We must hear the proof that if the plaintiff would not bid against the defendant, as he had intended to do, so as to enable the defendant to get seventy cents a day instead of forty, which he was getting. to feed and nurse the sick, then the defendant would give the plaintiff half the profits. And then we are asked to compel the defendant to perform that promise. Two men enter into a conspiracy to rob on the highway, and they do rob, and while one is holding the traveller the other rifles his pocket of $1,000 and then refuses to divide, and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy and the rencounter and the treachery. Will a Court of justice hear them ? No case can be found where a Court has allowed itself to be so abused.

Now if these robbers had taken the $1,000 and invested it in some legitimate business as partners, and had afterwards sought the aid of the Court to settle up that legitimate business, the Court would not have gone back to enquire how they first got the money; that would have been a past transaction, not necessary to be mentioned in the settlement of the new business. And this illustrates the case of *Brooks* v. *Martin, supra,* so much relied on by plaintiff. I do not mean by the illustration to class the parties before us with robbers, or otherwise to characterize their transaction than according to the facts of their case. It is not necessary that we should say more than that probably they thought it allowable to make a sharp bargain at the expense of the public, and that we cannot help them in it.

There is error in the order appealed from directing an account.

The plaintiff is not entitled to an account. The report of the referee ought to have been confirmed, declaring the alleged contract illegal and void, and that the Court will not lend its aid to enforce it.

PER CURIAM. Judgment reversed and judgment here for the defendant.

RODMAN. J., *dissenting.* I dissent from the opinion of the Court because I think this case cannot be distinguished from *Brooks* v. *Martin,* 2 Wall. 70. I think the plaintiff can make out his case without going into proof of the fraudulent transactions.